**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 322946)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          bscott@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DASSAH MAKETA, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| TARGET CORPORATION and TARGET BRANDS, INC., | |
| Defendants. | |

Plaintiff Dassah Maketa ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants Target Corporation and Target Brands, Inc. ("Defendants" or "Target").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself which is based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of herself and similarly situated consumers who purchased Target brand Up & Up Flexible Fabric Bandages ("Bandages" or the "Products").

2.      Defendants' Products are adhesive bandages that serve millions of people daily for the treatment of cuts, scrapes, and burns.

3.      The Products' packaging claims the bandages are "stretchable, breathable protection" and contain "sterile adhesive bandages." The packaging further states that the Products are "not made with natural rubber latex."

4.      However, unbeknownst to consumers, the Products are unfit for their intended purpose because they contain PFAS, "forever chemicals," which are dangerous to human health.

5.      PFAS are a group of synthetic chemicals. Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers.

6.      Furthermore, the Centers for Disease Control and Prevention ("CDC") outlined a host of health effects associated with PFAS exposure, including liver damage, decreased fertility, and increased risk of asthma.

7.      Accordingly, Plaintiff bring claims against Defendants individually and on behalf of a class of all others similarly situated for claims of breach of warranties, fraud, state consumer protection laws, and unjust enrichment.

**PARTIES**

8.      Plaintiff Dassah Maketa is, and at all times relevant to this action has been, a resident of Fremont, California. In or around May 7, 2022, Ms. Maketa purchased Defendants' Up & Up Flexible Fabric Bandages from a Target store located in Fremont, California. When Ms. Maketa made her purchase, she believed that the Products were safe because they were they were intended to be used directly on skin for "use on minor cuts, scrapes and burns." Ms. Maketa's belief was based on her review of the Product's advertising and marketing, and she relied on Defendants' representations in making her purchase. Had Defendants disclosed on the label that the Products contained PFAS chemicals, and the harms that can result from contact with PFAS chemicals, she would not have purchased the Products, or at the very least, would have only been willing to pay significantly less. As a direct result of Defendants' material misrepresentations and omissions, Ms. Maketa suffered, and continues to suffer, economic injuries. Ms. Maketa would consider purchasing Defendants' Products in the future if Defendants removed the PFAS chemicals from them.

9.      Defendant Target Corporation is a Minnesota corporation, with its principal executive offices located at 1000 Nicollet Mall, Minneapolis, Minnesota.

10.     Defendant Target Brands, Inc. is a subsidiary of Target Corporation, with its principal executive offices located at 1000 Nicollet Mall, Minneapolis, Minnesota.

11.     Defendants have store locations nationwide and have manufactured, marketed, and sold the Products nationwide in stores and online, including in California.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). There are more than 100 Class Members, the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Member is a citizen of a state different than Defendant.

13.     Defendants are a corporation under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), and therefore are citizens of Minnesota because Defendants have its principal place of business in the State of Minnesota.

14.     This Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves to the benefits of the forum, and because a substantial portion of the events giving rise to this complaint occurred in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because this District is where a substantial part of the conduct giving rise to Plaintiff's claims occurred.

**FACTUAL ALLEGATIONS**

**I.      The Products and Defendants' Marketing**

16.     Defendants market and sell flexible fabric bandages of various sizes under the brand name Up & Up in Target stores and online.

17.     The Products claim to provide "stretchable, breathable protection" that are adhesive to human skin. Each bandage has adhesive flaps with an absorbent pad in the center that serves as a cushion for cuts, scrapes, and other injuries to the skin.

18.     According to the packaging, the Products are "sterile" and "not made with natural rubber latex."



19.     However, Defendants' packaging of the Products does not disclose the presence of PFAS chemicals.

20.     Reasonable consumers purchased and continue to purchase Defendants' Products under the reasonable belief that they do not contain synthetic chemicals that could adversely impact their health or the health of their children.

**II.     PFAS in Defendants' Products.**

21.     Defendants' Products poses a health and safety risk due to the presence of PFAS in the Products.

22.     Mamavation is a consumer "watchdog" community group, which provides "eco-wellness product investigations for moms."

23.     To enable consumers to avoid the harms associated with PFAS chemicals, Mamavation has commissioned consumer studies on numerous beauty and personal care products, foods and beverages, supplements, menstrual products, clothing, food packaging and parchment paper, baby and children products, electronic equipment, and cleaning and laundry products.

24.      Because of known toxicity associated with PFAS, Mamavation commissioned scientific studies on indications of PFAS in bandages, to analyze popular bandages marketed to consumers.

25.     To conduct the studies, bandages were purchased and donated from Mamavation community members between November 2022 and February 2024 from Walmart, CVS, Rite Aid, Target, and Amazon. Each of the products tested was recorded in Mamavation's database and then sent directly to the lab within the product's original packaging.

26.     Mamavation sent 40 bandages from 18 brands for testing at an EPA-certified laboratory, including Up & Up Flexible Fabric Bandages.

27.     Mamavation's EPA-certified laboratory uses marker testing to identify the potential presence of PFAS chemicals in bandages. Organic fluorine is a marker for PFAS because all PFAS are carbon-based compounds that contain fluorine. The specific laboratory method used to test for total fluorine was the Determination of Total Fluorine by Oxygen Flask Combustion and IonSelective Electrode. If total fluorine was observed at a detection level of 10 ppm or greater, the laboratory did the Determination of free Fluoride Ion in the product by Ion-Selective Electrode and then subtracted that from the Total Fluorine to determine the amount of organic fluorine. This

marker testing is likely to show the presence of PFAS. Organic fluorine can also capture other fluoropolymers, pharmaceuticals, and common hydrofluorocarbon refrigerants, such as 1,1,1,2-tetrafluoroethane (commonly known as R-134a) and 2,3,3,3-tetrafluoropropene (commonly known as HFO-1234yf), which are all also PFAS chemicals.

28.     Total organic fluorine analysis is used to detect organic fluorine, which is the foundational element (and defining characteristic) of PFAS chemicals.

29.      In the context of chemistry, the term "organic" refers to compounds containing carbon. Organic fluorine is created by the chemical bond between carbon atoms and fluorine atoms. The strong bond created between carbon and fluorine is what defines PFAS chemicals and is the reason for their common usage.

30.     Total organic fluorine testing is critical to the detection of the 99.99% of PFAS that cannot be detected through limited targeted testing. Because organic fluorine is the identifying element of PFAS chemicals and is present in all PFAS varieties, the detection of organic fluorine in a sample necessarily means that PFAS chemicals are present in some form.

31.     It is nearly impossible for total organic fluorine testing to yield a false positive detection of PFAS in a sample. Total organic fluorine testing only measure fluorine that originates from a substance where fluorine is attached to a carbon backbone. Therefore, total organic fluorine testing does not detect any other forms of fluorine, such as inorganic fluorine (i.e., fluoride).

32.     Organic fluorine is not naturally present in the human body, and is practically nonexistent outside of its use in man-made PFAS chemicals.

33.      In light of the limitations of targeted testing, total organic fluorine testing is the only method that is able to reliably detect the presence or absence of the thousands of varieties of PFAS chemicals for which targeted testing is not currently available.

34.     Consequently, total organic fluorine testing is widely accepted by scientists, researchers, and regulators as the reliable method to detect a PFAS chemical in a sample.

35.      According to Scott Belcher, Ph.D. & Associate Professor with the Center for Environmental & Health Effects of PFAS at North Carolina State University, "fluoropolymers, such as polytetrafluoroethylene (PTFE), are extremely common forms of PFAS that could be

contributing to the organic fluorine found in bandages. Methods used for detecting individual PFAS, such as PFOA or GenX, cannot directly identify PTFE. However, the analysis of total organic fluorine (TOF) does account for all PFAS contaminants in bandages, including PTFE. Therefore, this method of testing serves as a good 'spot-check' of consumer products."

36.     Testing of Defendants' Bandages found 256 parts per million (ppm) organic fluorine on the absorbent pad and 253 ppm on the sticky flaps.

37.     In response to the results of the studies, Linda Birnbaum, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences and National Toxicology Program & Scholar in Residence at Duke University stated: "Because bandages are placed upon open wounds, it's troubling to learn that they may also be exposing children and adults to PFAS. It's obvious from the data that PFAS are not needed for wound care, so it's important that the industry remove their presence to protect the public from PFAS and opt instead for PFAS-free materials."

**III.     PFAS Chemicals Are Harmful to Humans**

38.     According to the Agency for Toxic Substances and Disease Registry, PFAS chemicals "are man-made chemicals that have been used in industry and consumer products worldwide since the 1940s.  They have been used to make nonstick cookware, water-repellent clothing, stain resistant fabrics and carpets, some cosmetics, some firefighting foams, and products that resist grease, water, and oil."

39.     One common characteristic of concern in regard to PFAS is that many types break down very slowly and can build up in people, animals, and the environment over time. In fact, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and our bodies.

40.     Consequently, PFAS chemicals are often referred to as "forever chemicals."

41.     PFAS are often divided into two groups: long chain and short chain, both of which break down slowly, if at all. In fact, long chain PFAS have been banned in the European Union and phased out by major U.S. manufacturers due to their health risks.  Regardless of length, research

from the U.S. National Toxicology Program suggests that both long chain and short chain PFAS have similar levels of toxicity.

42.     PFAS chemicals have been connected with severe and lingering health consequences.  Erika Schreder, Director of Science at Toxic-Free Future, and Jennifer Dickman, Senior Program Associate of Safer Chemicals, Healthy Families, have explained that "[p]rimary among [PFAS-linked health concerns] are cancer and effects on lipid metabolism, but they also include immune suppression, thyroid disease, and harm to reproduction."

43.     Similarly, Dr. Lina S. Birnbaum, stated that "[t]hese toxic chemicals are linked to serious problems like cancer, liver damage, decreased fertility, and asthma. … PFAS can [also] weaken our immune system, making us more vulnerable to infectious diseases like COVID-19."

44.     In children, PFAS has also been linked to "[l]ower antibody response[s] to some vaccines," thereby rendering children more vulnerable to disease they would otherwise be immune from.

45.     Significantly, a study conducted by the National Institute for Occupational Safety and Health found that "dermal exposure to PFOA is immunotoxic and raise concern about potential adverse effects from dermal exposure."

46.     PFAS chemicals can be harmful at extremely low levels of exposure. According to the EPA, the levels at which negative human health effects could occur are significantly lower than previously understood, including at near zero in some instances.

47.     In other words, there is no "safe" level of exposure to PFAS chemicals. Even "trace" levels of PFAS can be harmful to human health.

48.     There is no effective treatment for removal of PFAS chemicals from the body. Therefore, experts agree that the most effective strategy to decrease health risk is to avoid and/or limit exposure to products known to contain PFAS chemicals.

49.     Only in recent years has the presence of PFAS used in consumer products, and their consequent risks, begun to be publicized and discussed in the media and scientific literature. Based on this newly available information, consumers are rightfully concerned about the presence or risk of PFAS in various consumer products.

50.     In June 2022, the EPA announced a lifetime health advisory related to PFAS. A health advisory is not a binding regulation but serves as "informal technical guidance to assist government officials." The June 2022 advisory sets lifetime health advisory levels for PFOA at 0.004 parts per trillion (ppt) and PFOS at 0.02 ppt. These levels are below the detection capability of most measurement devices, meaning that EPA considers any detection of PFOA or PFOS to exceed the lifetime health advisory level.

51.     On April 10, 2024, the Biden Administration issued the first-ever national, legally enforceable drinking water standard to protect communities from exposure to PFAS. The standards set a maximum contaminant level of 4 parts per trillion for PFOA and PFOS individually. For other forms of PFAS, the maximum set by the Administration is 10 parts per trillion.

52.     Moreover, for PFOA and PFOS, the EPA is setting a Maximum Contaminant Level health-based goal at zero. This is reflective of the latest science supporting that there is no level of exposure to PFAS without risk of health impacts, including several cancers.

53.     For context, 10 parts per trillion equates to .0001 parts per million. This means that the PFAS found in Defendants' Bandages of up to 256 parts per million goes well beyond the limitations set forth by the government on drinking water.

**IV.     Defendants' Misrepresentations And Omissions Are Actionable**

54.     Plaintiff and Class Members would not have purchased the Products on the same terms had they known the truth about the Product.

55.     Nowhere on the Products packaging or labels do Defendants disclose the presence of PFAS. Reasonable consumers would believe the Products to be free of harmful toxins.

56.     Moreover, on Target's website page to purchase the Products, Defendants state, "we believe making smart choices for the people, places, and pets in your life should be easy and affordable. And having quality you can trust should be a given. That's why you can count on our promise – caring for your everyday in every way."

57.     Plaintiff and Class Members bargained for bandages that were free of harmful toxins, and were deprived of the basis of their bargain when Defendants sold them a Product containing PFAS.

58.     Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

59.     Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendants were under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Products and to disclose that the Products may contain substances known to have adverse health effects.  Defendants, as manufacturers or parties to a contract to manufacture, thereby providing and approving designs of the Products, and as sellers and advertisers of the Products, is best situated to know the content of its Products. Nonetheless, Defendants concealed and affirmatively misrepresented the true nature of the Products, as discussed herein.

60.     Consumers lack the expertise to ascertain the true ingredients in the adhesive bandages prior to purchase.

61.     Absent testing by a qualified lab, consumers such as Plaintiff and the Class Members were unable to determine that Defendants' Bandages contained PFAS chemicals given Defendants' failure to disclose the presence of PFAS.

62.     Accordingly, reasonable consumers must, and do, rely on Defendants to accurately and honestly advertise their products' ingredients and benefits. Further, consumers rely on Defendants to not contradict those representations by using artificial chemicals in their adhesive bandages that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

63.     Consumer reliance upon Defendants' representations and omissions were reasonable and foreseeable. It is beyond reasonable dispute that the presence of harmful chemicals in adhesive bandages, particularly Defendants' "quality you can trust" as advertised, is material to reasonable consumers.

64.     Defendants had exclusive knowledge of the contents and ingredients of its Bandages, including whether the products contained PFAS chemicals.

65.     Defendants also had exclusive knowledge of its ingredient suppliers and obtained or could have obtained information from their suppliers about the contents and ingredients to the Bandages, including whether they contained PFAS chemicals.

66.     Likewise, Defendants are in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe.

67.     Defendants' false statements, misleading, and material omissions are intentional and careless, and render their adhesive bandages worthless or less valuable.

68.     Had Defendants disclosed to Plaintiff and Class Members that their Bandages contained and contain PFAS chemicals, Plaintiff and Class Members would not have purchased Defendants' Bandages, or they would have paid significantly less for them.

69.     Plaintiff and Class Members were among the intended recipients of Defendants' deceptive representations and omissions described herein.

70.     Defendants' representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, especially for a consumer health product such as a bandage.

71.     In making the false, misleading, and deceptive representations, Defendants knew and intended consumers would pay a premium for their adhesive bandage products that are made from or contain synthetic or artificial chemical ingredients that are known to be harmful to humans and the environment.

72.     This is evidenced by the Products packaging, which states "not made with natural rubber latex," clearly as an appeal to consumer preference on ingredients of their products.

73.     A reasonable consumer would not expect dangerous and health threatening chemicals to be in a bandage claimed to be made from fabric and intended to be used to protect cuts and scrapes.

74.     Plaintiff and Class Members paid money for Defendants' Bandages, and paid a premium for an expected quality. However, Plaintiff and Class Members did not obtain the full value of the Products due to Defendants' misrepresentations as described herein.

75.     Plaintiff and Class Members purchased, purchased more of, or paid more for, Defendants' Bandages than they would have had they known the truth about the Products' harmful ingredients. Accordingly, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendants' wrongful conduct.

## **CLASS ALLEGATIONS**

76.     ***Nationwide Class.***  Plaintiff brings this nationwide class action pursuant to rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

> All persons in the United States who purchased the Products during the statute of limitations period (the "Class").

77.     Excluded from the Class are: (1) persons who made such purchases for purposes of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defense counsel.

78.     ***California Subclass.***  Plaintiff also seeks to represent a subclass of:

> All persons who purchased the Products in the State of California during the statute of limitations period (the "California Subclass").

79.     Excluded from the California Subclass are: (1) persons who made such purchases for purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defense counsel.

80.     As a result of additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate.

81.     ***Numerosity.***  At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclass ("Class Members" or "Subclass Members").  However,

given the nature of the claims, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

82.    ***Commonality and Predominance.***  There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class Members include:

- Whether the Products contain PFAS;
- Whether Defendants misrepresented and/or failed to disclose material facts concerning the Products;
- Whether Defendants had a duty to disclose the presence of PFAS in its Products;
- Whether the Products posed a health risk to consumers;
- Whether Defendants' conduct was unlawful;
- Whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon it by Plaintiff and the Class;
- Whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

83.    With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendants violated California Commercial Code § 2314; California Civil Code § 1790. *et seq.* Song-Beverly Consumer Warranty Act; Business & Professions Code § 17500, *et seq.*, California's False Advertising Law; and Business & Professions Code § 17200, *et seq.*, California's Unfair Competition Law.

84.    ***Typicality.***  The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like other members of the Classes, purchased the Products, relying on the representations and warranties made by Defendants on its packaging and online that the Products were safe and did not contain harmful chemicals.

85.    ***Adequate Representation.***  Plaintiff is an adequate representative of the Class and California Subclass because her interests do not conflict with the interests of the Class Members

she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiff and her counsel.

86.     ***Superiority.***  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation of California's Unfair Competition Law,
### California Business & Professions Code § 17200, *et seq.*
### (On Behalf Of The California Subclass)

87.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

88.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendants.

89.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

90.     By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

91.     Defendants have violated the UCL's proscription against engaging in **Unlawful Business Practices** because of their violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breach of warranty and violations of common law.

92.     As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.  In addition, Defendants have committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

93.     Plaintiff and the California Subclass Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

94.     Defendants have also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendants' acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

95.     There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

96.     Defendants have further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendants' claims, nondisclosures, and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

97.     Plaintiff and the other California Subclass Members suffered a substantial injury by virtue of buying the Products that they would not have purchased, or paying more than they otherwise would have for the Products, absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

98.     There is no benefit to consumers or competition from deceptively marketing and omitting materials facts about the true nature of the Products.

99.     Plaintiff and the other California Subclass Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

100.     The gravity of the consequences of Defendants' conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immortal, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other California Subclass Members.

101.     Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, requiring Defendants to (a) provide restitution to Plaintiff and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff and the California Subclass's attorneys' fees and costs.

**COUNT II**
**Violation of California's False Advertising Law ("FAL")**
**California Bus. & Prof. Code § 17500, *et seq.***
**(On Behalf Of The California Subclass)**

102.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

103.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendants.

104.     Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive California Subclass Members and the public.  As described above, and throughout this Complaint, Defendants misrepresented the Products as providing protection, when in fact, the Products were not safe because of the inclusion of PFAS chemicals.

105.     By its actions, Defendants disseminated uniform advertising regarding the Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of California Business & Professions Code § 17500, *et seq.*  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

106.    The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants failed to disclose that the Products contains substances that pose a significant risk to the health and well-being of Plaintiff and the California Subclass Members.

107.    Defendants continue to misrepresent to consumers that the Products are safe for its intended use and are of a "quality you can trust."  However, as described, that is not the case.

108.    In making and disseminating these statements, Defendants knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and other California Subclass Members based their purchasing decisions on Defendants' misrepresentation and omissions of material facts.  Plaintiff and California Subclass Members were injured in fact and lost money and property as a result.

109.    The misrepresentations and non-disclosures by Defendants of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of California Business & Professions Code § 17500, *et seq.*

110.    As a result of Defendants' wrongful conduct, Plaintiff and California Subclass Members lost money in an amount to be proven at trial.  Plaintiff and California Subclass Members are therefore entitled to restitution as appropriate for this cause of action.

111.    Plaintiff and California Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

112.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the PFAS in the Products and its effects; or (2) the removal of such chemicals from the Products, will ensure that Plaintiff and the California Subclass Members are in the same place they would have been in had Defendants' wrongful conduct not

occurred, i.e., the position to make an informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at their disposal.

### COUNT III
**Breach Of Implied Warranty Under The Song-Beverly Act**
**California Civil Code § 1700, *et seq.* And California Commercial Code § 2314**
**(On Behalf Of The California Subclass)**

113.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

114.     Plaintiff brings this claim individually and on behalf of the California Class against Defendants under California law.

115.     Under the Song-Beverly Consumer Warranty Act, California Civil Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

116.     The Products at issue here fall under "consumer goods" within the meaning of California Civil Code § 1791(a).

117.     Plaintiff and the California Class Members who purchased the Products are "retail buyers" within the meaning of California Civil Code § 1791.

118.     Defendants are in the business of manufacturing, assembling, and/or producing the Products and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of California Civil Code § 1791.

119.     Defendants impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used. For a consumer good to be "merchantable" under the Act, it must satisfy both elements. Defendants breached these implied warranties because the Products are unsafe. Therefore, the

Products would not pass without objection in the trade or industry and is not fit for the ordinary purpose for which it is used.

120.    Plaintiff and California Subclass Members purchased the Products in reliance upon Defendants' skill and judgment in properly packaging, labeling, and marketing the Products.

121.    The Products were defective at the time of sale when they were under the exclusive control of Defendants.  The issues described in this complaint were latent in the Products and not reasonably discoverable at the time of sale.

122.    Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and California Subclass Members.

123.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and California Subclass Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they are unfit for use and posed a significant safety risk.

124.    Plaintiff and the California Subclass seek compensatory damages, attorneys' fees, costs, and any other just and proper relief available under law.

**<u>COUNT IV</u>**
**Breach of Implied Warranty**
**(On Behalf Of The Nationwide Class)**

125.    Plaintiff, individually and on behalf of the Class, restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint.

126.    At all relevant times, Defendants were merchants of the Products that were sold to Plaintiff and Class members and were in the business of marketing, promoting, and selling such products to the consuming public. Defendants designed, developed, and sold the bandages knowing that Plaintiff and Class members would use the bandages.

127.    The Products sold by Defendants comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used. Defendants expected the consuming public, including Plaintiff and Class Members, to use the bandages on their skin and

such use was reasonably foreseeable. Plaintiff and Class Members also expected the bandages to be useable and to perform in a manner consistent with their packaging and labeling.

128.    Defendants breached its implied warranty of merchantability because their Products were not in merchantable condition when sold because they contain or have a material risk of containing dangerous PFAS.

129.    Defendants' Products are not fit for the ordinary purpose for which they were sold because they contain or have a material risk of containing dangerous PFAS.

130.    Defendants did not properly disclaim the warranty of merchantability and fitness for a particular purpose.

131.    As a result of Defendants' breaches of implied warranties of merchantability, as alleged herein, Plaintiff and the Class Members seek an order awarding compensatory damages and any other just and proper relief available under the law.

**COUNT V**
**Fraudulent Concealment**
**(On Behalf Of The Nationwide Class)**

132.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

133.    Plaintiff brings this claim individually and on behalf of the Nationwide Class.

134.    Defendants concealed and failed to disclose on the Products packaging and labeling the material fact that the bandages contained or risked containing PFAS, and that the bandages were not safe or healthy for use.

135.    As discussed at great length above, it has been widely publicized that PFAS are harmful chemicals to humans, animals, and the environment. The EPA, CDC and many other groups and publications have reported on the potential risks and dangers of PFAS chemicals. Accordingly, Defendants knew or should have known that PFAS are dangerous, and concealing this known fact is detrimental to the consumer.

136.    Defendants have a duty to disclose that the bandages contained or risked containing PFAS; however, Defendants did not make this disclosure.

137.     Plaintiff and the Class Members all paid a premium for the Products based upon the way the Products are represented, which did not include the inclusion of PFAS. Products that are tainted with PFAS are not worth a premium to a reasonable consumer.

138.     Defendants had superior knowledge or means of knowledge available to them and knew that Plaintiff and Class Members would rely upon the representations and omissions of Defendants regarding the quality and ingredients of its bandages. Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains PFAS, especially at the point of sale.

139.     Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiff and the Class Members are influenced by the ingredients and contents listed, as well as any warnings (or lack thereof) on the products they buy. Defendants know that if they had not omitted that the Products contained or risked containing PFAS, then Plaintiff and the Class Members would not have agreed to pay a premium price for the Products, or would not have purchased the Products at all; however, Defendants wanted to increase sales and profits.

140.     Defendants' concealment misled Plaintiff and the Class Members as to the true nature of what they were buying and putting onto their and their family's bodies.

141.     Defendants fraudulently concealed that the Products contained or risked containing PFAS. Consequently, Plaintiff and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

142.     Defendants had a duty to Plaintiff and the Nationwide Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf Of The Nationwide Class)**

143.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

144.     Plaintiff brings this claim individually and on behalf of the Nationwide Class.

145.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

146.    Plaintiff and the Nationwide Class Members conferred benefits on Defendants by purchasing the Products.

147.    Defendants were unjustly enriched in retaining the revenues derived from Plaintiff and the Nationwide Class Members' purchases of the Products.  Retention of those monies under these circumstances is unjust and inequitable because Defendants misrepresented and failed to disclose that the Products were unfit for their intended purpose as it was not safe for use.  These omissions and misrepresentations caused injuries to Plaintiff and the Nationwide Class Members because they would not have purchased the Products if the true facts were known.

148.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and the Nationwide Class Members is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

149.    Here, equitable relief in the form of non-restitutionary disgorgement of profits is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Products, Plaintiff and the Nationwide Class Members would be left without the parity in purchasing power to which they are entitled.

150.    Non-restitutionary disgorgement of profits may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff and the Class Members are in the same place they would have been in had Defendants' wrongful conduct not occurred, *i.e.*, the position to make an informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at their disposal.

151.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and the Class Members suffered injury and seek the disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by

the Court, and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendants as follows:

(a)   For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representatives of the Classes, and naming Plaintiff's attorneys as Class Counsel;

(b)   For an order declaring that Defendants' conduct violates the causes of action referenced herein;

(c)   For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

(d)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and;

(h)   For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

### JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

1

Dated:  April 30, 2024

**BURSOR & FISHER, P.A**.

2

By: ___*/s/ Brittany S. Scott*_____
       Brittany S. Scott

3

4

L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 322946)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
           bscott@bursor.com

5

6

7

8

9

*Attorneys for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28